**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

CRST EXPEDITED, INC.,

   Plaintiff,

vs.

TRANSAM TRUCKING, INC.,

   Defendant.

No. C16-52-LTS

**ORDER ON MOTIONS FOR**
**SUMMARY JUDGMENT AND TO**
**EXCLUDE TESTIMONY**

---

## I.   INTRODUCTION

This case is before me on cross-motions for summary judgment and a motion to exclude evidence. In its motion (Doc. No. 156) for summary judgment, defendant TransAm Trucking, Inc. (TransAm), seeks dismissal of all claims asserted by plaintiff CRST Expedited, Inc. (CRST). CRST's motion (Doc. No. 153) for partial summary judgment seeks (1) a determination that its employment contracts with its truck drivers are valid and (2) the dismissal of nearly all of TransAm's affirmative defenses. In a separate motion (Doc. No. 150), TransAm seeks to exclude CRST's damages expert and methodology.

All of the motions are fully briefed and ready for decision. I find that oral argument is not necessary.

## II.   PROCEDURAL HISTORY

CRST commenced this action on April 12, 2016, by filing a complaint (Doc. No. 2) against TransAm. CRST alleges that beginning in 2014, TransAm actively recruited and hired drivers who were under employment contracts with CRST. The contracts

prohibited the drivers from working for any CRST competitor for a specified amount of time, known as the Restrictive Term. Doc. No. 2 at ¶ 18. CRST asserts claims for (1) intentional interference with contract, (2) intentional interference with prospective economic advantage and (3) unjust enrichment. TransAm filed an answer (Doc. No. 31) on February 23, 2017, in which it denies liability on all claims and raises thirty-six affirmative defenses.

On June 9, 2017, TransAm filed a motion (Doc. No. 47) to dismiss for failure to join indispensable parties, which I denied (Doc. No. 79). In November 2017, TransAm filed a motion (Doc. No. 88) to dismiss for failure to state a claim and a motion (Doc. No. 96) to reconsider my ruling on the motion to dismiss for failure to join indispensable parties. I denied both motions in a combined order (Doc. No. 147) on March 30, 2018.

On April 18, 2018, TransAm filed its motions to exclude CRST's damages expert and for summary judgment. CRST filed resistances (Doc. Nos. 165, 167), TransAm replied (Doc. Nos. 174, 178) and CRST filed sur-replies (Doc. Nos. 183, 184). CRST also filed its own motion for partial summary judgment on April 18, 2018. TransAm filed a resistance (Doc. No. 166) and CRST replied (Doc. No. 173).

## III.   RELEVANT FACTS

The following facts are undisputed, except where noted otherwise:

CRST is an Iowa corporation based in Cedar Rapids, Iowa. TransAm is a Missouri corporation based in Olathe, Kansas. Both TransAm and CRST are commercial trucking companies. TransAm serves the Midwest, Southeast and Northeast regions of the United States and hauls both dry van freight and refrigerated protein. CRST provides freight-hauling services nationwide and also hauls both dry van freight and refrigerated or temperature controlled loads.[1] CRST offers expedited shipping. In order to meet

---

[1] The parties dispute the exact breakdown of how much dry freight versus refrigerated freight CRST hauls, but that dispute is irrelevant to the pending motions. Doc. No. 167-2 at 20–21; Doc. No. 176 at 29.

shipping deadlines, CRST uses a team driving system in which two drivers are assigned to a single truck and alternate driving responsibilities.

CRST and TransAm compete with each other in the labor market for qualified drivers. To work as a long-haul commercial truck driver, an individual must have a Class-A commercial driver's license (CDL). A CDL is typically obtained through truck driving school. To recruit drivers, CRST developed a Driver Training Program (DTP) through which it finances training upfront. In exchange, a driver promises to work for CRST for a specific amount of time after he or she obtains a CDL. The DTP is comprised of four phases: "(1) driver training at an educational facility;[2] (2) orientation at a CRST facility; (3) over-the-road training with [a] CRST lead driver; and (4) a professional development program consisting of ongoing classroom training and mentoring." Doc. No. 176 at 7.

During phase 1, CRST presents applicants with a Pre-Employment Driver Training Agreement. The agreement states that the cost of the training is an advance that the driver must pay back.[3] Under the agreement, if CRST offers the driver a Driver Employment Contract at the end of the training, the driver must accept it. However, CRST is not obligated to offer the student employment after the training is complete. Students must repay the advance whether or not (1) CRST chooses to hire them, (2) they are dismissed after being hired or (3) they voluntarily withdraw from the program.

Drivers who successfully complete phase 1 and pass a driving test receive their CDLs. Phase 2 consists of a two-to-three day orientation in which students receive a company handbook and learn about company policies and industry standards. Drivers

---

[2] CRST runs its own driving school, the North American Driver Training Academy (NADTA). CRST also pays other driving schools between $1,500 and $2,500 per student in tuition.

[3] The agreement states that the amounts advanced by CRST could equal or exceed $2,000. If the student breaches the employment contract or is terminated for due cause, the student will owe CRST $6,500 plus any additional amounts advanced by CRST. The parties dispute the actual cost of the training. Doc. No. 176 at 3–4, 9.

3

are then presented with a Driver Employment Contract, at CRST's discretion. A driver is not employed by CRST until signing the contract.[4] The Driver Employment Contract typically includes a Restrictive Term of 10 months during which the driver must drive exclusively for CRST.[5] If a driver is discharged or leaves employment before the Restrictive Term ends, the driver cannot work for any CRST competitor during the remainder of the Restrictive Term.[6] In addition, a driver who is discharged or leaves employment before the Restrictive Term ends is charged $6,500 plus any unpaid advances, regardless of the amount of time remaining on the Restrictive Term. CRST may terminate the Driver Employment Contract with or without due cause and the student will still owe the fee. The Restrictive Term may lapse if the employee pays the full amount due before the 10 month term expires.

TransAm does not operate its own driver training program. Rather, it recruits drivers who already have a CDL. TransAm receives between 30,000 and 80,000 driver applications a year to fill around 1,500 positions. TransAm recruits drivers by using standardized, nationwide advertising methods, including magazine and radio ads and postings on online job boards, TransAm's website and social media platforms. TransAm also offers a tuition reimbursement program, through which it reimburses drivers' tuition costs up to $6,000. This program does not apply to drivers who have already obtained

---

[4] However, many of the drivers' "hire dates," as set forth in CRST's termination records, do not match up with the dates on the contracts. *Compare* Doc. Nos. 156-7 at 6– 173; 156-9 at 51-54 *with* Doc. No. 155-2 at 199–200; Doc. Nos. 155-3 through 155-7; Doc. No. 155-8 at 2–13. In fact, only 28 contracts of 167 have matching dates.

[5] TransAm argues that not all of the contracts at issue include 10-month Restrictive Terms. Doc. No. 156-1 at 14. CRST denies this assertion. Doc. No. 167-1 at 32–33. However, there are some contracts at issue that contain 8-month Restrictive Terms. Doc. No. 155-4 at 11, 59; Doc. No. 155-3 at 96; Doc. No. 155-7 at 97. This issue will be discussed further below.

[6] The parties dispute whether the remaining time carries forward indefinitely, effectively acting as a lifetime ban until the driver either returns to CRST or pays damages, or if it simply expires 10 months after the driver was hired. Doc. No. 156-1 at 9; Doc. No. 167-1 at 21; Doc. No. 166-2 at 5–6; Doc. No. 173-1 at 11. This issue will be discussed further below.

4

their CDLs through other trucking company schools, such as CRST's. Drivers must contact TransAm to begin the hiring process. When a driver starts the hiring process, TransAm sends the driver's prior employer an employment verification request.

In this case, there are 167 drivers[7] with whom TransAm allegedly interfered. All of those drivers left CRST before their Restrictive Terms expired. TransAm sent CRST verification requests for all of these drivers at issue. CRST then sent TransAm notices stating that the drivers were under agreement with CRST and that CRST would send further information within 30 days of obtaining signed releases from the employees. CRST also sent TransAm a cease and desist letter on May 30, 2014.[8]

Additional facts will be discussed below, as necessary.

## IV.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical"

---

[7] Both parties agree there are 167 drivers at issue. However, the identities of these drivers is difficult to discern. One list cited by TransAm contains 293 names. Doc. No. 156-9 at 17–24. Another citation includes only 65 names. Doc. No. 156-4 at 6–180; Doc. No. 156-5 at 6–35. CRST's Driver Termination Records contain around 500 names. Doc. No. 156-7 at 6–522. The CRST Verification Spreadsheet contains almost 400 names. Doc. No. 156-11; Doc. No. 156-12 at 6–10. Most citations concerning the drivers or the contracts span hundreds of pages. The only item of evidence listing precisely 167 drivers is CRST's Fourth Supplemental Disclosures. Doc. No. 156-3 at 111. I will assume for purposes of this motion this is the relevant list.

[8] TransAm admits it received the letter but denies it is relevant because it addressed two drivers not at issue in this case. Doc. No. 176 at 23.

under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light

6

most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

On cross motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998).

## V. ANALYSIS

### A. Choice of law

TransAm asserts that Kansas law applies to the issues in this case. Doc. No. 156-2 at 14; Doc. No. 178 at 11. CRST asserts that Iowa law applies. Doc. No. 167 at 28–29. A federal court sitting in diversity must apply the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, (1941). Iowa employs the Second Restatement's "most significant relationship" test. *See Christie v. Rolscreen Co.*, 448 N.W.2d 447, 450 (Iowa 1989).

As a threshold matter, I must determine whether or not there is a "true conflict" between the substantive laws of Kansas and Iowa with regard to the pertinent issues. *See Harlan Feeders, Inc. v. Grand Labs., Inc.*, 881 F. Supp. 1400 (N.D. Iowa 1995); *see also Phillips v. Marist Soc'y of Wash. Province*, 80 F.3d 274, 276 (8th Cir. 1996) (agreeing with the Seventh Circuit Court of Appeals that "before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.") (quoting *Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir.1992), *cert. denied*, 506 U.S.

1001 (1992)). If there is no true conflict, then I will simply apply the laws of the forum state, Iowa. *Phillips*, 80 F.3d at 276.

TransAm contends that there is a true conflict between Iowa law and Kansas law with regard to the intentional interference claims. Doc. No. 156-2 at 11. Specifically, TransAm claims that the two states have conflicting standards of "improper" conduct. TransAm then argues that under Iowa's "most significant relationship test," Kansas law applies because nearly all of TransAm's recruiting efforts occurred in Kansas and none of the other relevant factors weigh in favor of Iowa. *Id.* at 14; Doc. No. 178 at 12–13.

CRST first argues there is no conflict between the two states' laws. Doc. No. 167 at 28. CRST next argues that even if there is a conflict, the most significant relationship test favors application of Iowa law. *Id.* at 28–29. Finally, CRST contends that TransAm is estopped from asserting that Kansas law applies because in a previous motion, TransAm argued that Iowa law applies. *Id.* at 30–31. I will address the estoppel argument first.

### 1. Estoppel

CRST states: "When a party asserts the law of the forum applies to the dispute but later in the litigation attempts to argue another state's law should apply, the party is estopped and waives its right to assert the law of another state in the litigation." Doc. No. 167 at 30 (citing *Lott v. Levitt*, 556 F.3d 564, 567-68 (7th Cir. 2009), *Wiser v. Wayne Farms*, 411 F.3d 923, 927-28 (8th Cir. 2005)). Even if CRST's statement of the law is correct, its description of what has actually happened in this case is misleading.

CRST cites TransAm's brief in support of its motion to strike (Doc. No. 106-1), in which TransAm cited an Iowa case for the elements of tortious interference with contract. Doc. No. 106-1 at 2. Up to that point, however, TransAm had argued multiple affirmative defenses under both Kansas and Iowa law. *See* Doc. No. 31 at 18–20. In its brief supporting its motion to dismiss for failure to join indispensable parties, TransAm

argued that Kansas law applied but cited both states' laws.[9]  Doc. No. 48 at 9 n.3.  I find no inconsistency that would even come close to establishing any kind of estoppel, judicial or otherwise, preventing TransAm from advocating for the application of Kansas law to CRST's tort claims.  CRST's estoppel argument fails.[10]

### 2.  True Conflict

CRST asserts three claims: (1) intentional interference with contract, (2) intentional interference with prospective economic advantage and (3) unjust enrichment.  Neither party contends that there is a conflict between Iowa and Kansas law regarding the unjust enrichment claim.  As such, I will apply Iowa law to that claim.  The only potential conflict involves the intentional interference claims.

### a.  Iowa Law

Under Iowa law, the elements for interference with an existing contract are: (1) plaintiff had a valid and enforceable contract with a third party, (2) defendant knew about that contract, (3) defendant intentionally and improperly interfered with the contract, (4) the interference caused the third party to breach or made performance more difficult, and (5) damages resulted.  *Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 243 (Iowa 2006); *Kent v. Iowa*, 651 F. Supp. 2d 910, 958 (S.D. Iowa 2009); *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 763 (Iowa 1999).

TransAm argues that the third element, improper conduct, conflicts with Kansas law.  Iowa courts look to the factors set forth in Section 767 of the Restatement (Second) of Torts to determine whether the defendant acted improperly.  *Fin. Mktg. Servs., Inc.*

---

[9] CRST has cited both states' laws in this case, as well.  *See* Doc. No. 53 at 8 n.2.

[10] In *Wiser*, the only Eighth Circuit case CRST cites in support of this argument, the issue was whether the appellant was entitled to raise a choice of law argument for the first time on appeal.  *Wiser*, 411 F.3d at 925-28.  The analysis in *Wiser* has no bearing on the present situation.

9

*v. Hawkeye Bank & Tr. of Des Moines*, 588 N.W.2d 450, 458 (Iowa 1999). These factors are: "(1) the nature of the conduct, (2) defendant's motive, (3) the interests of the party with whom the defendant interfered, (4) the defendant's interests, (5) interests in defendant's freedom of action versus the contractual interests of the other party, (6) proximity of defendant's conduct to interference, and (7) the relationship between the parties." *Id.* The focus is whether the defendant's conduct was "fair and reasonable under the circumstances." *Id.* (quoting *Toney v. Casey's Gen. Stores, Inc.*, 460 N.W.2d 849, 853 (Iowa 1990)).

The elements for tortious interference with a prospective economic advantage under Iowa law are: "(1) the plaintiff had a prospective contractual or business relationship; (2) the defendant knew of the prospective relationship; (3) the defendant intentionally and improperly interfered with the relationship; (4) the defendant's interference caused the relationship to fail to materialize; and (5) the amount of resulting damages." *Gen. Elec. Capital Corp. v. Commercial Servs. Grp. Inc.*, 485 F. Supp. 2d 1015, 1025 (N.D. Iowa 2007). Again, the alleged conflict is with the third element, improper conduct. The standard for improper conduct is different for this tort than for interference with an existing contract, as the plaintiff must show that the defendant acted "with the sole or predominant purpose to injure or financially destroy the plaintiff." *Compiano v. Hawkeye Bank & Tr. of Des Moines*, 588 N.W.2d 462, 464 (Iowa 1999). *See also Nesler v. Fisher & Co.*, 452 N.W.2d 191, 199 (Iowa 1990) ("In cases of interference with existing contracts, a purpose to injure or destroy is not essential. The situation is different in cases involving interference with prospective advantage.").

### b.    Kansas Law

Under Kansas law, the elements of tortious interference with an existing contract are: (1) existence of a valid and enforceable contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's "intentional procurement of its breach," (4) no justification for the interference and (5) resulting damages. *Diederich v. Yarnevic*, 196

10

P.3d 411, 418 (Kan. Ct. App. 2008); *Macke Laundry Serv. Ltd. P'ship v. Mission Assocs., Ltd.*, 873 P.2d 219, 225 (Kan. Ct. App. 1994). The elements for tortious interference with a prospective business advantage are:

> (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct be defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

*Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 151 (Kan. 2003) (quoting *Turner v. Halliburton Co.*, 722 P.2d 1106, 1115 (Kan. 1986)).

Both torts require some form of misconduct beyond the interference itself, just as under Iowa law. In *Turner*, the Kansas Supreme Court stated: "Both tortious interference with a contract and tortious interference with contractual expectations or a prospective business advantage are predicated on malicious conduct by the defendant." 722 P.2 at 1116. The Court looked to the Restatement (Second) of Torts § 767 factors to determine whether the defendant's behavior was "improper." *Id.* Courts applying Kansas law have cited *Turner* for the proposition that malice is required for both torts. *See, e.g., L&M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1288 (10th Cir. 2000). However, it does not appear that "malice" has been clearly defined.

When addressing the tort of interference with an existing contract, the Kansas Court of Appeals characterized "malice" as "a state of mind characterized by an intent to do a harmful act without reasonable justification or excuse," such as the defendant acting to further their own ends or divert some benefit under the contract to the defendant's own benefit. *Linden Place, LLC v. Stanley Bank*, 167 P.3d 374, 380 (Kan. Ct. App. 2007); *but see Ronald L. Jones Charitable Tr. v. Sanders*, Nos. 106, 690, 106, 691, 2012 WL 3966557 (Kan. Ct. App. Sept. 7, 2012) (defining malice in an interference with an existing contract case as "without justification" and using the Restatement's

11

"improper" factors). A federal court in Kansas, discussing tortious interference with an existing contract, has defined malice as an absence of justification, relying on the Restatement factors to determine whether the defendant's behavior was improper. *Furr v. Ridgewood Surgery and Endoscopy Ctr., LLC*, 192 F. Supp. 3d 1215, 1228-29 (D. Kan. 2016).

In the context of interference with a prospective economic advantage, the Kansas Court of Appeals has discussed malice in terms of whether the behavior was justified and considered the Restatement's "improper" factors. *M West, Inc. v. Oak Park Mall, L.L.C.*, 234 P.3d 833, 848-49 (Kan. Ct. App. 2010); *see also U.S. Transp., Inc. v. Torley*, No. 08-1403-MLB, 2011 WL 3704723 (D. Kan. Aug. 23, 2011) ("[g]enerally the court looks to Restatement (Second) of Torts § 767 to determine if a party's intentional interference is improper"); *Schartz v. Unified Sch. Dist. No. 512*, 953 F. Supp. 1208, 1220 (D. Kan. 1997) (using the Restatement factors to determine whether the defendant had used improper means to overcome her qualified privilege). In *Burcham*, the Kansas Supreme Court explained that both torts are "predicated upon malicious conduct" unless the defendant's actions are justified. *Burcham*, 77 P.3d at 152. The Court then cited the same Restatement factors used under Iowa law to determine whether the interfering conduct was improper. *Id.*

In one case, when discussing both torts, the Kansas Supreme Court made no mention of malice, instead stating that it would look to the Restatement factors to determine whether the defendant's behavior was justified. *Cohen v. Battaglia*, 293 P.3d 752, 756 (Kan. 2013). However, other cases applying Kansas law have required a higher standard of malice for interference with a prospective business advantage. The Tenth Circuit, citing *Turner*, stated that improper conduct was a requirement. *Reazin v. Blue Cross and Blue Shield of Kan., Inc.*, 899 F.2d 951, 977 (10th Cir. 1990). If the defendant could show that his or her improper conduct was justified, the plaintiff would have to show actual malice to prevail on an interference claim. *Id.* More recently, and again citing *Turner*, the Tenth Circuit defined malice in an interference with a prospective

12

business advantage case as "acting with 'actual evil-mindedness or specific intent to injure.'" *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1263 (10th Cir. 2005); *see also Triple-I Corp. v. Hudson Assocs. Consulting, Inc.*, 713 F. Supp. 2d 1267, 1286–87 (D. Kan. 2010) (stating that interference with a business advantage requires a showing of malice defined as evil-mindedness or specific intent to injure); *Brown v. Univ. of Kan.*, 16 F. Supp. 3d 1275, 1291 (D. Kan. 2014) (malice for interference with a business advantage is defined as acting with "actual evil-mindedness or specific intent to injure") (citing *Turner*).

### c.    The Comparison

With regard to CRST's claim for interference with an existing contract, I find no true conflict between Iowa and Kansas law. Both states use the same Restatement factors to determine whether the defendant's conduct is improper. As such, Iowa law will apply to that claim.

Whether there is a true conflict between Iowa and Kansas law regarding CRST's claim for interference with a prospective business advantage is slightly less apparent. Under Iowa law, there is no doubt that a plaintiff must show that the defendant acted "with the sole or predominant purpose to injure or financially destroy the plaintiff." *Compiano v. Hawkeye Bank & Tr. of Des Moines*, 588 N.W.2d 462, 464 (Iowa 1999). The cases applying Kansas law are not as consistent, but the more-recent cases support the proposition that Kansas, like Iowa, requires a showing of malice, which is defined as acting "with actual evil-mindedness or specific intent to injure." *Brown*, 16 F. Supp. 3d at 1291. Thus, I find no true conflict between Iowa and Kansas law concerning the claim of interference with a prospective business advantage and will apply Iowa law to that claim, as well.[11]

---

[11] Based on my conclusion that no true conflicts of law exist as to any of CRST's claims, I will not include a detailed analysis of Iowa's most significant relationship test in this order. However, I have carefully considered the parties' written arguments on this issue and find, in the

13

**B.      Intentional Interference with a Contract**

As noted above, the elements for this tort under Iowa law are: (1) plaintiff had a valid and enforceable contract with a third party, (2) defendant knew about that contract, (3) defendant intentionally and improperly interfered with the contract, (4) the interference caused the third party to breach or made performance more difficult, and (5) damages resulted.  *Green*, 713 N.W.2d at 243; *Kent*, 651 F. Supp. 2d at 958; *Revere Transducers*, 595 N.W.2d at 763.  TransAm argues that it is entitled to summary judgment on this claim because, as a matter of law, CRST cannot show (1) that it had valid and enforceable contracts with CRST drivers, (2) that TransAm had knowledge of any such contracts, (3) that TransAm's interference caused any drivers to breach their contracts, (4) that TransAm engaged in improper conduct and (5) that TransAm's conduct caused damages to CRST.  Doc. No. 156-2 at 2.  I will address each element separately.

**1.      Valid and enforceable contract**

The bulk of the parties' arguments, including those in CRST's own motion for summary judgment, revolve around this element.  TransAm presents multiple arguments as to why CRST has failed to generate a question of material fact on the existence of valid contracts.  First, TransAm argues that 67 of the 167 driver contracts at issue are materially different than the contract attached to the complaint.  Doc. No. 156-2 at 14–15.  Because the contracts are different, TransAm contends they are outside the pleadings and cannot form the basis of the claim.  *Id.*  Second, TransAm argues in a footnote that CRST cannot authenticate any of the 167 contracts.  *Id.* at 19 n.3.  Third, TransAm argues that the non-compete provision is unenforceable because (a) it is not tightly limited in time, area or competitors and (b) it is not necessary to protect CRST's business.  *Id.* at 15–19.

---

alternative, that the substantive law of Iowa would apply to CRST's claims if a true conflict existed as to any of those claims.

14

### a. Admissible Evidence

#### i. Authentication

TransAm contends that CRST has "only produced contracts it *allegedly* entered into." *Id.* at 19 n.3 (emphasis in original). TransAm argues that because the drivers are not parties and CRST did not depose any driver in discovery, it cannot authenticate any of the drivers' signatures on the contracts or prove that the drivers actually entered into the contracts. *Id.* TransAm points out that multiple contracts have no signatures and some are missing pages. Doc. No. 166 at 4–3. Therefore, according to TransAm, the contracts are inadmissible and CRST cannot show the existence of valid contracts with the drivers. *Id.* at 5; Doc. Nos. 156-2 at 19 n.3; 178 at 3.

CRST responds that it does not need the drivers' testimony to prove they entered into the contracts. Doc. No. 167 at 8 n.3. CRST states that the evidence it has submitted (its business records, the driver contracts and evidence of its driver program) is sufficient to demonstrate that the contracts exist. *Id.* CRST argues that it need not produce a witness with personal knowledge to authenticate every signature on every agreement because the contracts are self-authenticating. Doc. No. 173 at 7. Additionally, CRST argues that the drivers who did not sign their contracts can still be bound by an unsigned agreement. *Id.* at 7–8.

Federal Rule of Evidence 901 governs the authentication requirement. The proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Proponents may authenticate an item through "appearance, contents, substance, internal patterns, or other distinctive characteristics of the time, taken together with all the circumstances." *United States v. Young*, 753 F.3d 757, 773 (8th Cir. 2014). Once the burden is satisfied, the jury determines any further questions relating to authenticity. *Id.* The proponent need only establish a rational basis for the item's authenticity. *United States. v. Coohey*, 11 F.3d 97, 99 (8th Cir. 1993).

There is no authentication issue here. Under Federal Rule of Evidence 902(11), a record that meets the business record requirements of Rule 803(6) "as shown by a certification of the custodian or another qualified person" is considered self-authenticating. TransAm does not contest the contracts' admissibility under the business records exception to hearsay. *See* Doc. No. 166 at 5. The foundation requirements for business records under Rule 803(6) are satisfied if the custodian shows the records have been prepared and kept in the course of regularly conducted business activity. The custodian does not need personal knowledge of each individual document's preparation. *United States v. Franks*, 939 F.2d 600, 602 (8th Cir. 1991). Nor does he or she need to have been present when the document was created. *See United States v. House*, 825 F.3d 381, 389 (8th Cir. 2016); *Coohey*, 11 F.3d at 100.

Jenny Abernathy, Vice President of Capacity Development at CRST, states in her affidavit that the drivers at issue entered into the employment contracts attached to her affidavit. Doc. No. 155-2 at 197. Michael Gannon, Chief Operating Officer of CRST, testified that since 2003 CRST has required all drivers from its training program to enter Driver Employment Contracts. *Id.* at 194. The contracts are akin to the contract submitted with CRST's initial pleadings and contain the names of the 167 drivers at issue. Based on the undisputed facts, I find that the contracts are admissible.[12]

### ii.    *Materially different contracts*

TransAm also argues that 67 of the contracts at issue are materially different than the contract CRST attached to its complaint because some are governed by other states'

---

[12] If TransAm is arguing that the lack of signatures means that the contracts are not binding, that is an assent argument, not an authentication argument. The key to proving the contract is mutual assent. *Schaer v. Webster Cty.*, 644 N.W.2d 327, 338 (Iowa 2002). In the absence of a statute requiring a signature or stating that a contract is not binding until it is signed, the signatures of both parties are not essential to establish a binding contract. *Subcliff v. Brandt Engineered Prod. Ltd.*, 459 F. Supp. 2d 843, 852 (S.D. Iowa 2006). The record is insufficient to make a determination on this point as a matter of law.

16

laws, some have no restrictive covenant, some have only an 8-month Restrictive Term (rather than 10-month) and some are "rehire contracts."[13] Doc. No. 156-2 at 14–15. TransAm contends these differences put the contracts "outside the pleadings" and thus are not sufficient to show the existence of valid contracts. *Id.* CRST responds that different choice of law clauses are irrelevant because TransAm cannot assert state-specific defenses that may be available to individual drivers. Doc. No. 167 at 14.

TransAm did not cite any law in support of this argument, which accurately suggests that this argument should not have survived final editing. An element of CRST's claim for intentional interference is that it had valid contracts with certain drivers. The contracts submitted relate to whether that element is met or not. I will not exclude them simply because some are different from the example contract attached to the complaint.[14]

### b. *Void versus voidable*

CRST argues that TransAm does not have legal standing to raise arguments about whether the restrictive covenants in the driver contracts are unreasonable. CRST contends that if a contract term is unreasonable, the contract is not automatically void but, instead, is voidable at the discretion of either party to the contract. Doc. No. 155 at 4–6; Doc. No. 167 at 10–11. According to CRST, TransAm is liable if it improperly

---

[13] Only 62 of the contracts TransAm takes issue with actually correspond to names of drivers at issue. *Compare* citations at Doc. No. 166 at 6 *with* Doc. No. 156-3 at 11.

[14] I will briefly address TransAm's argument that some contracts do not contain restrictive covenants. *See* Doc. No. 156-2 at 15. TransAm cannot interfere with a contract if no contract exists, and cannot interfere with an employee who is not working for CRST if no restrictive covenant exists. *See* Restatement (Second) of Torts § 766 ("The particular agreement must be in force and effect at the time of the breach that the actor caused."). But whether a contract had a restrictive covenant, or how long that covenant might last, affects whether the driver in question was bound by the contract at the time of the alleged interference. This goes to the merits of CRST's claim concerning that contract but does not render the contract inadmissible.

17

interfered with a contract that was not void ab initio and had not been voided at the time of the interference. *Id.* TransAm argues that the void/voidable distinction is "outdated" and that it can argue that the contract is both invalid and unenforceable. Doc. No. 166 at 7.

The void/voidable distinction is far from outdated. Iowa courts have continued to follow the Restatement (Second) of Torts for intentional interference cases. *See Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 665 (Iowa 2008); *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 601 (Iowa 1999); *RTL Distrib., Inc. v. Double S Batteries, Inc.*, 545 N.W.2d 587, 590 (Iowa Ct. App. 1996). This court has discussed the void/voidable distinction in two companion cases. *CRST Expedited, Inc. v. JB Hunt Transp., Inc.* No. 17-CV-26 CJW; No. 17-CV-24 CJW, 2018 WL 2768874 at *11 (N.D. Iowa June 8, 2018); *CRST Expedited, Inc. v. Swift Transp. Co. of Ariz., LLC*, No. 17-CV-25-CJW, 2018 WL 2016274, at *9 (N.D. Iowa Apr. 30, 2018). In a previous order in this case, I held that even if a party to a contract had a valid defense to a breach of contract claim, TransAm could still be liable for interfering with that contract. Doc. No. 147 at 14 n.10.

Under the Restatement, "[i]t is not . . . necessary that the contract be legally enforceable against the third person. A promise may be valid and subsisting even though it is voidable." Restatement (Second) of Torts § 766 cmt. f. The third party (in this case any of the drivers) may have a defense that would allow him or her to avoid the contract while the interfering party may still be liable for the interference. *Id.*; *JB Hunt,* 2018 WL 2768874 at *11. If the contract is voidable, one or more of the parties has the option to choose to avoid the legal consequences of the contract. Restatement (Second) of Contracts § 7. A contract may be voidable if a party to the contract was an infant or a minor, or the contract was induced by fraud, mistake or duress. *Id.* "In the case of a voidable contract, if neither party seeks avoidance, the court cannot void the contract, and the contract remains valid." *Nichols v. City of Evansdale*, 687 N.W.2d 562, 571

Case 1:16-cv-00052-LTS-KEM   Document 193   Filed 07/31/18   Page 18 of 34

(Iowa 2004)(citing *First State Bank v. Shirley Ag Serv., Inc.*, 417 N.W.2d 448, 452 (Iowa 1987)).

Even if a contract may be voided "by reason of the statute of frauds, formal defects, lack of mutuality, infancy, *unconscionable provision*, conditions precedent to the obligation or even uncertainty of particular terms," the allegedly interfering party can still be liable for interference. Restatement (Second) of Torts § 766 cmt. f (emphasis added). However, if a contract in place at the time of the interference was void from its inception, the defendant may avoid liability for interfering. *Id.*; *JB Hunt*, 2018 WL 2768874 at *11. A void contract is "a promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance." Restatement (Second) of Contracts § 7 cmt. a. For example, a contract in violation of public policy is void. *Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 684 n.4 (Iowa 2001).

TransAm's arguments as to whether the restrictive covenants are reasonably limited, or are necessary to protect CRST's business, fall in the "voidable contract" category. Iowa courts enforce restrictive covenants if they are reasonable. *Ag Spectrum Co. v. Elder*, 865, F.3d 1088, 1091 (8th Cir. 2017). A covenant not to compete is unenforceable if the restrictions are unconscionable. *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1258 (N.D. Iowa 1995). As noted above, however, even if a contract may be avoided "by reason of . . . unconscionable provision[s]," the defendant may still be liable for interference. Restatement (Second) of Torts § 766 cmt. f. Thus, to the extent TransAm argues that the restrictive covenants are unreasonable, such that the drivers would have defenses if CRST sued to enforce them, that argument does not benefit TransAm. I agree with CRST that TransAm does not have standing to challenge the reasonableness of the restrictive covenants.

By contrast, TransAm is entitled to argue that the restrictive covenants create a "lifetime ban" that renders the contracts void from their inception as that argument, if successful, it would negate the first element of the interference claim. This argument requires interpretation of the driver contracts. Even though TransAm is not party to

19

those contracts, it is entitled to raise this contract interpretation argument. *See JB Hunt*, 2018 WL 2768874 at *11 ("[D]efendant is just as capable of making the legal arguments available to the drivers based on the terms of the contract.").

TransAm contends that CRST's interpretation of the restrictive covenant turns it into a lifetime ban from the trucking industry. Doc. No. 156-2 at 16; Doc. No. 178 at 8–9. The Driver Employment Contract attached to CRST's complaint states:

> The term of CRST's employment of Employee under this Contract shall be for a period of ten (10) months commencing as of the Effective Date (the "Term") subject to termination prior to the end of the Term pursuant to Section 4 of this Contract. Following the Term, CRST shall employ Employee on an at-will basis, and either party may terminate the employment relationship at any time effective immediately.

Doc. No. 156-3 at 24. The Effective Date is the date a driver enters into the contract. *Id.* The contract goes on to state that "Employee agrees and covenants that for a period equal to the greater of the Restrictive Term and the duration of CRST's employment of Employee, Employee will not directly or indirectly provide truck driving services to any CRST Competitor within the continental United States of America." *Id.* at 24–25. The Restrictive Term is defined as "any period of the Term remaining after the termination of CRST's employment of Employee with or without cause by either party." *Id.* at 25. The term can lapse if the employee pays back the full amount CRST advanced for that employee's training. *Id.*

TransAm argues that CRST interprets this restriction such that, for example, a driver who leaves CRST after five months cannot work for a CRST competitor until the driver returns to CRST and works another five months. Thus, even a driver who left CRST ten years ago, with any time left on the Restrictive Term, would be barred from working for any CRST competitor. TransAm cites testimony from David Rusch, President and CEO of CRST, that CRST considers the Restrictive Term to be an obligation a driver carries indefinitely until the driver comes back to work for CRST for

20

whatever time remains on the driver's Restrictive Term. Doc. No. 167-1 at 21; Doc. No. 156-3 at 50; Doc. No. 156-3 at 52–56.

CRST does not dispute this testimony. Instead, it argues that the individual interpretations of CRST's officers do not change the express terms of the driver contracts or the legal authority governing covenants not to compete.[15] Doc. No. 167-1 at 21 n.3. I agree with CRST that the plain meaning of the restrictive covenants does not support the "lifetime ban" interpretation. *See Pro-Edge, L.P. v. Gue*, 419 F. Supp. 2d 1064, 1085 (N.D. Iowa 2006) (stating that the intent of the parties controls the meaning of the terms, as determined by the language of the contract, and it is the court's duty to give effect to the language in accordance with its plain and ordinary meaning); *DuTrac Cmty. Credit Union v. Radiology Grp. Real Estate, L.C.*, 891 N.W.2d 210, 216 (Iowa 2017) (recognizing that restrictive covenants are contracts and the contract-based rules of construction should apply). The covenants limit the time a driver agrees not to compete with CRST to "a period equal to" the remaining time on the Restrictive Term or the amount of time the driver was employed with CRST. The plain, commonly understood meaning of "a period equal to" would mean, for example, that a driver who has five months left on the Restrictive Term would be bound for five months after his or her employment ended, not bound indefinitely until the driver returns to work for CRST for five additional months. Indeed, CRST's complaint in this case is limited to drivers who were allegedly recruited by TransAm while still within the Restrictive Term.

Thus, even if some CRST employees interpret the restrictive covenants more expansively, the plain meaning of those covenants controls. TransAm has failed to show that, as a matter of law, CRST had no valid contracts with any of the 167 drivers at issue

---

[15] CRST generally argues that a covenant not to compete is necessary to protect its business and the training it gives employees, and that the provision is appropriately balanced against the harm to the drivers. Doc. No. 167 at 5–10. But it does not specifically address the interpretation of the time limit.

at the time of TransAm's alleged interference. TransAm is not entitled to summary judgment based on the first element of CRST's intentional interference claim.

## 2. TransAm's knowledge of the contract

TransAm argues that it did not know the drivers at issue had employment agreements with CRST and that the verification responses it received from CRST were insufficient to put it on notice. Doc. No. 156-2 at 20. TransAm contends that many notices were for drivers who had already been discharged by CRST or whose restrictive terms had expired, such that it had no way of knowing which notices were credible and which ones were not. *Id.*; Doc. No. 178 at 15–16. TransAm argues that it is not reasonable to expect it to investigate each notice. Doc. No. 156-2 at 20–21. Finally, TransAm argues that it would have been impossible for it to investigate further – even if it had known of potential employment contracts, – because CRST's own policies limit the information CRST provides to other employers. Doc. No. 178 at 15-16.

CRST argues that TransAm need only have knowledge of the existence of a contract, not of its specific terms, and that CRST provided such knowledge by virtue of the verification responses. Doc. No. 167 at 14–15. CRST contends that it sent notices and additional follow-up letters for individual drivers, indicating they were under contract.[16] *Id.* at 15. CRST also sent TransAm a cease and desist letter in May 2014, explaining that CRST's drivers were still under contract. *Id.* at 15–16. CRST argues that, at minimum, TransAm was on inquiry notice that contracts existed. *Id.* at 16–17.

The plaintiff must prove that the defendant knew of the existence of a contract. *Revere Transducers*, 595 N.W.2d at 764. It is not necessary to show the defendant had actual knowledge of the specific contract, only that the defendant knew "of facts which, if followed by reasonable inquiry, would have led to the disclosure of the contractual

---

[16] CRST also accuses TransAm of hiding the letters from its employees and forwarding them to its attorneys. Doc. No. 167 at 15. This accusation is not relevant to the present motions.

22

relationship." *Id.* If the actor is aware of facts giving rise to the contractual duty, he or she is subject to liability even if mistaken about their legal significance and believes the agreement is not binding. Restatement (Second) of Torts § 766 cmt. i.

TransAm relies on *ACT, Inc. v. Sylvan Learning Sys., Inc.*, 296 F.3d 657 (8th Cir. 2002), to argue that it did not have knowledge of the contracts. In that case, both ACT and Sylvan were working with a third company, NASD, regarding the use of computer-based testing centers. *Id.* at 660. While Sylvan was aware that ACT and NASD had done some co-marketing and shared space at trade shows, the court held that this general knowledge was not sufficient to put Sylvan on notice that ACT had contracts with NASD with which Sylvan might interfere. *Id.* at 663.

TransAm also cites *Criterion 508 Sols., Inc. v. Lockheed Martin Servs., Inc.*, 806 F. Supp. 2d 1078 (S.D. Iowa 2009). Doc. No. 178 at 17. That case involved an employee who accepted employment with Lockheed after being discharged by Criterion. *Id.* at 1083–84. She found this new employment through a third party that assisted Lockheed in locating employees. *Id.* The employee had not informed the third party that she was bound by a noncompete agreement with Criterion. *Id.* at 1085. In addition, she signed an agreement with Lockheed stating she was not restricted by any agreement with a former employer. *Id.* While she later sent an email to another Lockheed employee stating that she had previously worked for Criterion, the court found there was insufficient evidence to show that Lockheed was on notice that a restrictive covenant existed. *Id.* at 1085, 1101–02.

TransAm's situation is distinguishable from these two cases. TransAm had direct communications from CRST that the drivers were at least potentially under some form of contract. An exemplary employment verification from CRST states that "[t]his employee is under an employment agreement with CRST. We will send further information within 30 days of receipt of a signed release (PDF only) from the employee." Doc. No. 156-5 at 147; *see also* Doc. No. 156-6 at 6–361 (individual driver employment verifications sent to TransAm). The follow-up letters stated that "[t]he below-named

individual is currently under a contract with CRST" and "CRST is not releasing this driver from his or her contractual commitment." *See* Doc. No. 167-5 at 1–181; Doc. No. 167-6 at 1–181.[17]

Dean Cochran, the director of driver retention at TransAm, stated that he did discuss previous employment contracts with drivers and that few drivers told him they were under contract. Doc. No. 167-9 at 155. However, he also stated that he received letters from other carriers regarding the verification of drivers but did not read them. *Id.* at 156. Instead, he sent the letters to TransAm attorneys. *Id.* In May 2014, CRST sent TransAm a cease and desist letter stating that TransAm had hired at least two former CRST drivers despite receiving notice of their existing contracts. Doc. No. 2-2.

This evidence indicates knowledge of more than a mere "business relationship," such as the kind at issue in *ACT*. Reasonable jurors could find that notices such as those CRST sent to TransAm indicated that further investigation was necessary. TransAm is free to argue that such an investigation would not have revealed the existence of the contracts because CRST would not have communicated with TransAm. *See Revere Transducers*, 595 N.W.2d at 764 (stating that the facts need to be followed only to a "reasonable inquiry"). However, the only evidence TransAm cites in seeking summary judgment on this issue is a Frequently Asked Questions sheet that states "never talk to another Company or Lawyer about a termed driver." Doc. No. 156-6 at 365–67. This does not establish, as a matter of law, that further communications with CRST itself would have been futile. Nor is there evidence suggesting that TransAm attempted to inquire further with CRST after receiving the employment verification notices.

As for the argument that TransAm did not know which letters/contracts were genuine and which were not, TransAm's examples involve drivers who are not among

---

[17] CRST submitted letters relating to many drivers beyond the 167 at issue. Additionally, after cross-checking these letters with CRST's Fourth Supplemental Disclosures (Doc. No. 156-3 at 111–113), it appears there are no letters regarding 6 of the 167 drivers (Phylicia Gary, Bernas Hernandez Reyes, Corrine Horner, Anthony Johnson, Keith Lee and Dewey Thomason Jr.).

24

the 167 who are at issue. *Compare* Doc. No. 156-2 at 20 and Doc. No. 178 at 16 with Doc. No. 156-3 at 111–13. In any event, I find that TransAm is not entitled to summary judgment on this question of whether it had knowledge of the existence of the contracts at issue.

### 3.    Causation

TransAm argues that CRST cannot show that TransAm caused any of the drivers at issue to breach their contracts. Doc. No. 156-2 at 21. TransAm claims that because only 18 to 26 percent of all CRST drivers actually complete their Restrictive Terms, there is no evidence that TransAm was the cause of any particular driver's breach. *Id.* TransAm also argues that according to CRST's own records, all of the drivers at issue were either discharged or left employment for reasons unrelated to TransAm. *Id.* TransAm claims that 94 of the drivers at issue had no contact with TransAm until after leaving CRST, another 45 applied to other trucking companies at about the same time they applied to TransAm, and 6 more testified that they initiated contact with TransAm. *Id.*

CRST argues that 134 of the 167 drivers had direct contact with TransAm before terminating their employment with CRST.[18] Doc. No. 167 at 20. CRST also states that some drivers who leave before their contracts expire return to work for CRST. *Id.* Therefore, if TransAm had not hired the drivers at issue, they could have returned to CRST. *Id.* Finally, CRST argues that multiple causes do not shield TransAm from liability. *Id.* at 23.

The plaintiff must show that the defendant's interference "caused the third-party not to perform, or made performance more burdensome or expensive." *Green*, 713 N.W.2d at 243 (Iowa 2006) (quoting *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388,

---

[18] Because 94 plus 134 equals 228 drivers, or 61 more than the 167 at issue, it appears that TransAm and CRST are interpreting the evidence differently.

399 (Iowa 2001), in turn quoting *Jones v. Lake Park Care Ctr., Inc.*, 569 N.W.2d 369, 377 (Iowa 1997)); *see also King v. Sioux City Radiological Grp., P.C.*, 985 F. Supp. 869, 882 (N.D. Iowa 1997). Thus, the question is whether TransAm induced or caused some or all of the 167 drivers at issue to breach their contracts with CRST, not whether the loss of the drivers created economic loss for CRST or whether the drivers would have returned to CRST at some point in the future. *See* Doc. No. 167 at 20–21.

Iowa has adopted the Restatement (Third) of Torts as setting forth the appropriate standards of causation in tort cases. *See Thompson v. Kaczinski*, 774 N.W.2d 829, 839 (Iowa 2009); *State v. Tribble*, 790 N.W.2d 121, 127 n.2 (Iowa 2010). In *Thompson*, the Iowa Supreme Court explained that tort liability traditionally requires a showing of both "cause in fact" and "legal cause." *Id.* at 836. The Court then acknowledged that the legal, or proximate, cause analysis "has been the source of significant uncertainty and confusion." *Id.* In discussing, and ultimately adopting, the approach set forth in the Third Restatement, the Court stated:

> "Tort law does not impose liability on an actor for all harm factually caused by the actor's tortious conduct." Restatement (Third) ch. 6 Special Note on Proximate Cause, at 574. This concept has traditionally been designated "proximate cause." While this term is used extensively and appropriately by courts, practitioners, and scholars, it causes considerable confusion for juries because it does not clearly express the idea it is meant to represent. *See id.* § 29 cmt. b, at 576–77. The confusion arises when jurors understand "proximate cause" as implying "there is but one cause—the cause nearest in time or geography to the plaintiff's harm—and that factual causation bears on the issue of scope of liability." *Id.* § 29 cmt. b, at 577. Thus, in an attempt to eliminate unnecessary confusion caused by the traditional vernacular, the drafters of the third Restatement refer to the concept of proximate cause as "scope of liability."
>
> The drafters of the Restatement (Third) explain that the "legal cause" test articulated in the second Restatement included both the "substantial factor" prong and the "rule of law" prong because it was intended to address both factual and proximate cause. *Id.* ch. 6 Special Note on Proximate Cause, at 574. Although the "substantial factor" requirement has frequently been understood to apply to proximate cause determinations, *see Gerst*, 549

26

N.W.2d at 815–16, the drafters contend it was never intended to do so. Restatement (Third) § 29 cmt. a, at 576. Accordingly, to eliminate the resulting confusion of factual and policy determinations resulting from the Restatement (Second) formulation of legal cause, the drafters have opted to address factual cause and scope of liability (proximate cause) separately. Restatement (Third) ch. 6 Special Note on Proximate Cause, at 575. The assessment of scope of liability under the Restatement (Third) no longer includes a determination of whether the actor's conduct was a substantial factor in causing the harm at issue, a question properly addressed under the factual cause rubric. *See id.* § 27 cmt. j, at 427–29.

Most importantly, the drafters of the Restatement (Third) have clarified the essential role of policy considerations in the determination of the scope of liability. "An actor's liability is limited to those physical harms that result from the risks that made the actor's conduct tortious." *Id.* § 29, at 575. This principle, referred to as the "risk standard," is intended to prevent the unjustified imposition of liability by "confining liability's scope to the reasons for holding the actor liable in the first place." *Id.* § 29 cmt. d, at 579–80.

*Id.* at 837-38 (footnotes omitted). Thus, under Iowa law the evaluation of legal, or proximate, causation requires consideration of whether the harm that flowed from the actor's tortious conduct was within the scope of the risks that rendered the conduct tortious in the first place.

While the Third Restatement redefines the concept of legal causation, it does not alter the traditional requirement of actual, or "but for," causation. Section 26 states:

Tortious conduct must be a factual cause of harm for liability to be imposed. Conduct is a factual cause of harm when the harm would not have occurred absent the conduct. Tortious conduct may also be a factual cause of harm under § 27.

Restatement (Third) of Torts § 26. Section 27 states:

If multiple acts occur, each of which under § 26 alone would have been a factual cause of the physical harm at the same time in the absence of the other act(s), each act is regarded as a factual cause of the harm.

*Id.* § 27. The drafters included the following comment to Section 26:

27

The standard for factual causation in this Section is familiarly referred to as the "but-for" test, as well as a *sine qua non* test. Both express the same concept: an act is a factual cause of an outcome if, in the absence of the act, the outcome would not have occurred.

*Id*. § 26 cmt. b. I find nothing in *Thompson*, or the subsequent decisions of the Iowa Supreme Court, to suggest that Iowa's adoption of the causation principles set forth in the Third Restatement has changed the traditional analysis of factual causation under Iowa law. Thus, I must consider whether CRST has produced evidence that would allow reasonable jurors to find that TransAm's interference caused any of the drivers at issue not to perform, or made performance more burdensome or expensive. *See Gibson*, 621 N.W.2d at 399. Despite the voluminous evidentiary record before me, I conclude that the answer is "no."

At the outset, I agree with TransAm that the mere hiring of an employee with knowledge that the employee is breaching a contract with another party does not satisfy the causation requirement. The Restatement, in defining the tort of intentional interference with contract, states:

> *Making agreement with knowledge of the breach*. One does not induce another to commit a breach of contract with a third person . . . when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person. . . . For instance, B is under contract to sell certain goods to C. He offers to sell them to A, who knows of the contract. A accepts the offer and receives the goods. A has not induced the breach and is not subject to liability under the rule stated in this Section.

Restatement (Second) of Torts § 766 cmt. n;[19] *see also Engenium Solutions, Inc. v. Symphonic Technologies, Inc.*, 924 F. Supp. 2d 757, 798-799 (S.D. Tex. 2013) (citing

---

[19] The Iowa Supreme Court has referenced Section 766 in addressing claims of intentional interference with contract. *See, e.g., Kern v. Palmer College of Chiropractic*, 757 N.W.2d 651, 663-64 (Iowa 2008); *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 601 (Iowa 1999).

cases for the proposition that the plaintiff must prove that the defendant induced or persuaded the breach). Inducement occurs when a party conveys to a third party its "desire to influence [the third party] not to deal with the other." Restatement (Second) of Torts § 766 cmt. k. This may be done through requests, persuasion, threats, or promises. *Id.*

CRST relies on evidence of hiring dates at TransAm to show causation.[20] CRST states that TransAm "recruited" CRST drivers, but the only evidence CRST cites for this assertion is that some drivers had contact with TransAm before their employment with CRST ended. Doc. No. 167 at 20. CRST also cites the affidavit of Jenny Abernathy, who states that drivers "frequently" have their employment verified but do not leave CRST and "many drivers who leave CRST return to its employment after a period of absence." Doc. No. 167-9 at 326.

By my count, based on the evidence of record, 82 drivers had initial contact with TransAm after they left CRST, four drivers had contact with TransAm before they were even hired by CRST, four had contact with TransAm the same day they left CRST, and three who were hired twice by CRST had contact with TransAm after they left the first time, but before they left a second time.[21] *Compare* Doc. No. 156-7 *with* Doc. No. 156-6 at 368–71. Seven drivers are missing first contact dates and two are missing termination dates. *Id.* CRST's termination records reveal various reasons the drivers left. Doc. No. 156-7. Only seven of the 167 termination records mention TransAm and three mention trucking companies other than TransAm or CRST. Doc. No. 156-7 at 39, 52, 58, 76,

---

[20] CRST also relies on evidence of the hiring practices of another trucking company, CR England. Doc. No. 167 at 21. Those practices are not relevant to whether TransAm induced the drivers at issue to breach their contracts.

[21] CRST cites to 516 pages of records to support a characterization of data on the 167 drivers. I have compiled the names of the drivers at issue, as well as information from their contracts, termination dates and hiring dates at TransAm from a multitude of different documents in order to make some sense of the claims and allegations the parties have made.

29

111, 115, 131, 137, 146, 160. Six of the drivers at issue were rehired by CRST. Doc. No. 155-3 at 17; Doc. No. 156-4 at 123–29, 137; Doc. No. 156-5 at 24, 29, 34.

Contact alone does not create a jury question as to whether TransAm induced the breach, especially when there is no indication of what contact occurred (if any). Six of the drivers testified by affidavit that they were the first to contact TransAm and were not recruited. *See* Doc. No. 156-8 at 36 (Ramon Hernandez), 39 (Quamell Moye), 40 (Christopher Nichols), 41 (Che Ramlal), 42 (Joshua Rayborn) and 44 (Brodrick Smith). The only other mention of how contact was made between the drivers and TransAm is a list that includes "mobile," "web app," "client," "job board," "short form" and "import" as possible methods. Doc. No. 156-6 at 368–71; *see also* Doc. No. 156-5 at 132, 140–41, 145 (describing TransAm's advertising methods). Further, many of the drivers were also applying to other companies around the same time – or even after – applying to TransAm. *See* Doc. Nos. 156-11 and 156-12; Doc No. 156-13 at 6–10 (verification spreadsheet); Doc. No. 156-3 at 111–13 (CRST Fourth Supplemental Disclosures).

The fact that numerous drivers may have breached their contracts with CRST by accepting employment with TransAm does not, by itself, create a question of fact as to whether TransAm caused or induced those breaches. This is true even if TransAm knew that the contracts existed when it hired the drivers at issue. CRST argues that because some drivers who are not at issue in this case stayed with CRST after other trucking companies sent employment verifications, TransAm must have induced the drivers who are at issue to breach their contracts. However, this is pure speculation, wholly unsupported by any evidence in the summary judgment record.

I find that CRST has failed to generate a genuine question of material fact on the crucial issue of whether TransAm's caused or induced any of the drivers at issue to breach their contracts with CRST. The only evidence of TransAm's actions towards the drivers is its general advertising practices via job boards, magazines, radio and online postings. *See* Doc. No. 156-5 at 132, 140–41, 145. There is no evidence that the drivers at issue would not have breached their contracts absent TransAm's involvement. Nor is there

30

evidence, beyond the act of hiring itself, that TransAm induced these drivers to breach. Evidence that is merely colorable or only provides "some metaphysical doubt" is not sufficient to generate a question of material fact. Because the evidence fails to support an essential element of CRST's claim for intentional interference with existing contracts, I will grant TransAm's motion for summary judgment on that claim.

## C.    *Intentional interference with prospective economic advantage*

The only element of this claim that either party has addressed is the third element: that the defendant intentionally and improperly interfered with CRST's prospective economic advantage. TransAm argues that CRST cannot, as a matter of law, show that TransAm acted with the level of intent and purpose that this tort requires. Doc. No. 156-2 at 23–24. As noted earlier, under Iowa law a plaintiff must show that the defendant acted "with the sole or predominant purpose to injure or financially destroy the plaintiff." *Compiano*, 588 N.W.2d at 464.

In its complaint, CRST describes the prospective economic advantage as being its driver training program. Doc. No. 2 at ¶¶ 26-28. In resisting summary judgment on this claim, CRST relies on its notice of contract letters, TransAm's tuition reimbursement program (Doc. No. 167-9 at 252–56) and TransAm's lack of driver turnover (Doc. No. 167-9 at 276–78) as evidence that TransAm's motive is to injure or destroy CRST financially. *Id.* at 32–34; Doc. No. 184. CRST argues that because TransAm does not pay reimbursement for drivers who obtain their CDLs through other trucking companies and TransAm is not struggling to find applicants, the fact that it has hired and retained drivers who are under contract with CRST shows that its motive is to injure CRST.

The summary judgment record does not create a question of material fact on the element of improper conduct. As noted above, it was not tortious for TransAm to hire a driver even if TransAm had knowledge that the driver is already under contract with CRST. For purposes of the prospective economic advantage claim, simply retaining drivers it already hired is not sufficient to demonstrate that TransAm's sole or

31

predominant purpose was to injure CRST. Because the evidence is insufficient to generate an issue of fact on this element, TransAm is entitled to summary judgment on the prospective economic advantage claim.

### D.     Unjust Enrichment

Under Iowa law, to prove unjust enrichment a plaintiff must show: (1) the "defendant was enriched by receipt of a benefit; (2) the enrichment was at the expense of the plaintiff, and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." *State, Dept. of Human Services ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154–55 (Iowa 2001). Unjust enrichment may "arise from contracts, torts, or other predicate wrongs, or it may also serve as independent grounds for restitution." *Palmer*, 637 N.W.2d at 154; *see also* Restatement (First) of Restitution § 134(1) (1937) ("A person who has obtained the services of another by conduct which is tortious towards the other is under a duty of restitution to the other for the value of the services.").

TransAm argues for summary judgment on this claim because it has not received anything of value that belongs to CRST. Doc. No. 156-2 at 2. TransAm notes that CRST's damages calculations are based on the alleged "poaching profits" TransAm realized by employing drivers who had been trained by CRST. *Id.* at 25 (citing Doc. No. 156-3 at 114-121). TransAm contends that these profits are not benefits that were conferred by CRST. *Id.* TransAm also argues that the unjust enrichment claim is completely dependent upon the tortious interference claim, as without any wrongful interference it would not be unjust to allow TransAm to keep the "benefit" of the drivers' services. *Id.* Thus, TransAm argues that because CRST's tortious interference claims fail as a matter of law, its unjust enrichment claim also fails. *Id.* CRST argues that TransAm received the benefit of saved expenses by not paying for the drivers' training. Doc. No. 167 at 41, 42–43. CRST further contends that it is unjust to allow TransAm to retain the benefit of already-trained drivers when it did not pay for the training and the drivers are still bound by a contract. *Id.* at 44-45.

32

Both of TransAm's arguments are on point. First, TransAm received no benefit from CRST. Instead, it hired drivers who had obtained their CDLs after being trained by CRST. While any employer benefits when a new employee already has obtained all necessary training and licensure, the profits realized from such an employee are not benefits conferred by a former employer. "The theory of unjust enrichment 'is premised on the idea that it is unfair to allow a person to benefit from another's services when the other expected compensation.'" *Waldner v. Carr*, 618 F.3d 838, 848 (8th Cir. 2010) (quoting State Pub. Defender v. Iowa Dist. Court for Woodbury County, 731 N.W.2d 680, 684 (Iowa 2007)). Damages are "limited to the value of what was inequitably retained." *Iowa Waste Sys., Inc. v. Buchanan County*, 617 N.W.2d 23, 30 (Iowa Ct. App. 2000). The profits TransAm may have realized by employing former CRST drivers are entirely disconnected from the value of any services CRST may have performed. In other words, those profits are not benefits conferred on TransAm by CRST. *Compare Catipovic v. Turley*, 68 F. Supp. 3d 983, 996-97 (N.D. Iowa 2014) (profits the defendants realized by constructing an ethanol plant are not evidence of the value of services provided by the plaintiff).

Second, CRST's unjust enrichment claim is dependent upon its claim that TransAm acted tortiously. CRST argues that it is unjust to allow TransAm to retain the benefit of trained drivers "where it deliberately chose not to pay for its competitor's training program" and that TransAm "consciously interfered" with the contractual relationships at issue. Doc. No. 167 at 44. Absent wrongful conduct, however, there is no legal basis for an argument that TransAm has unjustly retained any benefit. *See Okoboji Camp Owners Co-op. v. Carlson*, 578 N.W.2d 652, 654 (Iowa 1998) (explaining that only when interference in the affairs of other is not justified will the benefited party be required to make restitution); Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. b (2011) ("[T]he fact that a benefit is retained, enjoyed, and profitably exploited by the recipient, all without compensation, does not necessarily mean that the recipient has been unjustly enriched."). Because CRST has failed to show that

33

TransAm's conduct constituted intentional interference with contract, or intentional interference with prospective economic advantage, its unjust enrichment claim fails as a matter of law.[22]

## VI. CONCLUSION

For the reasons set forth herein:

1.      Defendant's motion (Doc. No. 156) for summary judgment is **granted in its entirety**. All of plaintiff's claims are hereby **dismissed with prejudice**.

2.      Defendant's motion (Doc. No. 150) to exclude plaintiff's damages witness and evidence is hereby **denied as moot**.

3.      Plaintiff's motion (Doc. No. 153) for summary judgment is hereby **denied**.

4.      The trial of this action, currently scheduled to begin October 9, 2018, is hereby **canceled**.

5.      Pending motions (Doc. Nos. 185, 186) to intervene and unseal documents by intervenor Swift Transportation Co. of Arizona will remain open for determination.

6.      Judgment shall enter in favor of the defendant and against the plaintiffs and the Clerk shall **close this case**.


**IT IS SO ORDERED.**

**DATED** this 31st day of July, 2018.

_____
Leonard T. Strand, Chief Judge

---

[22]  Because I have found that TransAm is entitled to summary judgment on all claim asserted by CRST in this case, I will deny TransAm's motion (Doc. No. 153) to exclude CRST's damages evidence and CRST's motion for summary judgment (Doc. No. 153) as being moot.

34